IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALFONSO HERNANDEZ,

      Plaintiff,

v.                                          CIV 12-394 KBM-ACT

DANIEL BACA et al,

      Defendants.

## DEFENDANTS' OPPOSED MOTION, AND MEMORANDUM IN SUPPORT, FOR SUMMARY JUDGMENT REQUESTING DISMISSAL OF PLAINTIFF'S COMPLAINT ON QUALIFIED IMMUNITY GROUNDS

**COME NOW**, Defendants David Baca (misidentified in the caption as "Daniel Baca") Jennifer Jara, Leah Kelly, Jacob Welch, and the City of Albuquerque, by and through their attorney, Assistant City Attorney Stephanie M. Griffin and hereby state the following for Defendants' Opposed Motion, and Memorandum in Support for Summary Judgment Requesting Dismissal of Plaintiff's Complaint on Qualified Immunity Grounds:

## INTRODUCTION

This case involves two separate incidents where Plaintiff interacted with police who were inquiring whether he had a valid permit to give away food in the Fourth Street Mall area.  While giving out food is a noble thing to do; the City has an obligation to ensure that people are not being poisoned or sickened by the food that is being given out.  The City has voiced its concerns to Plaintiff multiple times about ensuring that he is giving away food that is permissible under the Food Sanitation Ordinance.  Surrounding businesses were also complaining that the large crowds of people who were lining up to be fed were interfering with their clientele.  As a result, officers, including the named defendants in this action were told by high-ranking police officials

to investigate whether food was being served in accordance with the City of Albuquerque Consumer Health Department guidelines.  Two such occasions concern the subject incidents involved in this lawsuit which occurred on August 8, 2010 and on September 12, 2010.

On August 8, 2010 Plaintiff was ultimately detained in the Fourth Street Mall area by Officer Welch and Office Lonz, who is not a party to this action, as they inquired into whether he had a valid permit to distribute food.  As will be explained in more detail below, Plaintiff was eventually issued a Criminal Trespass Notification on August 8, 2010 directing him not to return to the premises. However, despite this, Plaintiff did return to the premises on September 12, 2010 during which he was again questioned, this time by Officer Jennifer Jara, about whether he had a permit to distribute food in the Fourth Street Mall area.  As Officer Jara was attempting to engage Plaintiff in discussion about the permitting issue, she was told about the Criminal Trespass Notification being issued to Plaintiff by Officer Welch so Plaintiff was placed under arrest. It is Defendants' position that their actions in dealing with Plaintiff were reasonable under the totality of circumstances and that their actions did not result in a clearly established constitutional violation.  Consequently, Defendants contend that they are entitled to qualified immunity.

## STATEMENT OF FACTS

The following is a statement of facts which are being set forth for the limited purposes of this motion only:

1.      Approximately six years ago, Plaintiff started serving food to a homeless group of people, whom he refers to as the "Metro Campers," in the Fourth Street Mall area of downtown Albuquerque.  [See Exhibit A – Deposition of Plaintiff Alfonso Hernandez at 15:3-6; 16:1-4]

2.      When he made the decision to begin serving food on the Fourth Street Mall area, he did not speak with anyone from the City of Albuquerque to discuss whether there were any requirements which he needed to fulfill first before serving the food.  [Exhibit A at 25:2-9]

3.      Officers were advised by superior officers that there had been complaints from businesses in the area about a large crowd of people who were gathering in the Fourth Street Mall area to be fed.  There were complaints that members of the crowd were also urinating, and leaving trash and feces in the area.  [See Exhibit B, ¶ 3 – Affidavit of Jacob Welch and Exhibit C, ¶ 3 – Affidavit of Jennifer Jara]

4.      Due to all of the complaints which had been generated, officers were directed to go downtown and ask the persons who were distributing food if they had any City permit which authorized them to do so.  [See Exhibit B, ¶ 4 and Exhibit C, ¶ 4]

5.       On August 8, 2010, Officer Welch went to the Fourth Street Mall area along with Officer Tim Lonz at approximately 1:47 p.m. where he observed a large crowd of people who were being served food by a male, who was later identified as Plaintiff Alfonso Hernandez. [Exhibit B, ¶ 5]

6.      Officer Welch observed that Mr. Hernandez was serving food out of cardboard boxes, so he approached him and asked him if he had a permit to serve the food, and Mr. Hernandez said that he did not have a permit so Officer Welch told him that he needed to have a permit or that he needed to contact a homeless shelter and work under their permit.  Mr. Hernandez responded by telling Officer Welch that he was not going to stop serving food, and he did in fact continue to serve food.  [Exhibit B, ¶¶ 6, 7, and 8]

7.      Mr. Hernandez continued to serve food even though the officers told him repeatedly that he needed to have a permit in order to continue to serve food, at one point, Mr.

Hernandez said in response that he was exercising his religious rights and that the officers did not have a right to stop him. [Exhibit B, ¶ 9]

8.      Mr. Hernandez had not been placed in handcuffs, searched, or otherwise seized when Officer Lonz and Officer Welch talked about the permit with him and Mr. Hernandez's movements were not restricted when they were discussing the permitting issue. [Exhibit B, ¶ 10]

9.      The only directive that Officer Welch gave Mr. Hernandez was to stop serving food unless he could produce a valid permit, but he ignored this directive and continued to serve food.  [Exhibit B, ¶ 12]

10.     As Mr. Hernandez continued to serve food, the large crowd of people started to shout "Let's start a riot" and "F*ck the Police" [Exhibit B, ¶ 13]

11.     Officer Lonz removed Mr. Hernandez from the crowd and placed him into handcuffs since the crowd was becoming disorderly and incited by his actions in continuing to serve food after he was directed to stop until he could produce a permit. [Exhibit B, ¶ 14]

12.     Officer Welch did not tell Officer Lonz to handcuff Mr. Hernandez or to search Mr. Hernandez's person.  [Exhibit B, ¶ ¶ 15 and 16]

13.     Mr. Hernandez was removed from the scene and placed in the back of a police car until the crowd had dispersed and calmed down.  In all, Mr. Hernandez was in the back of the police car and in handcuffs for approximately 20 minutes.  [Exhibit B, ¶ 18]

14.     Once the crowd dispersed and the scene was calm, Officer Welch released Mr. Hernandez from the police car and handcuffs, and he issued him a citation for not having a permit and also issued him the attached Criminal Trespass Notification – Order Not to Return. [See Exhibit B1]

15.     Mr. Hernandez left the premises and Officer Welch had no further contact with him on August 8, 2010. [Exhibit B, ¶ 20]

16.     The encounter that took place on August 8, 2010 between the officers and Mr. Hernandez was recorded on a belt tape as reflected on Tracks 1 and 2 on the CD which is submitted as an "Exhibit D" to this motion. [Exhibit D]

17.     On September 12, 2010, Officer Jara went to the Fourth Street Mall area at approximately 2:39 p.m. along with Officer Leah Kelly where she observed a crowd of people who were being served food. [Exhibit C, ¶ 5]

18.     Officer Kelly [Acata] contacted two individuals, who were later identified as Michael Herrick and Jennifer Gage.  Officer Kelly [Acata] had no contact with Mr. Hernandez. [See Exhibit D – Affidavit of Leah Acata]

19.     Officer Jara approached Alfonso Hernandez and asked him if he had a permit, and he refused to answer her.  [Exhibit C, ¶ 6]

20.     Officer Welch arrived on scene and told Officer Jara that he had just issued a Criminal Trespass Notification to Plaintiff Alfonso Hernandez on August 8, 2010, and he was told not to return to the premises.  After learning this information, Officer Jara asked Mr. Hernandez about the Criminal Trespass Notification, and he refused to answer her so she asked him again, but he continued to ignore her. [Exhibit C, ¶ 8]

21.     Instead of answering Officer Jara's question, Mr. Hernandez continued to walk around the area and place items in his truck which was illegally parked in the alleyway of the Fourth Street Mall area.  [Exhibit C, ¶ 9]

22.     Mr. Hernandez was issued a parking citation and Officer Jara verified the existence of the Criminal Trespass Notification and arrested Mr. Hernandez. [Exhibit C, ¶ 10]

23.     Officer David Baca, who was already on scene, then escorted Mr. Hernandez away from the scene and subsequently handcuffed him using standard handcuffing techniques and eventually transported him to the Prisoner Transport Center ("PTC").  Officer Baca did not otherwise search or seize Mr. Hernandez.  [See Exhibit E – Affidavit of David Baca]

24.      While at the PTC, Officer Jara saw that Mr. Hernandez somehow managed to remove the handcuffs that he was in, so she went into the holding cell and placed him back in the handcuffs. [Exhibit C, ¶ 12]

25.     Officer Jara placed the handcuffs back on Mr. Hernandez using standard handcuffing techniques and she checked to make sure that there was enough spacing between the handcuffs and his wrists so that they would not be on too tight. [Exhibit C, ¶ 13]

26.     Officer Jara did not use force, or strike, or take Mr. Hernandez down to the ground when she placed the handcuffs back on him. [Exhibit C, ¶ 14]

27.     Officer Welch did not touch, seize, search, speak with, or otherwise interact with Mr. Hernandez on September 12, 2010.  [Exhibit B, ¶ 23]

28.     Officer Kelly did not use any force against Mr. Hernandez or charge him with any crimes or direct that he be arrested on September 12, 2010. [Exhibit D, ¶¶ 6, 7, and 8]

29.     Mr. Hernandez claims that after he slipped out of the handcuffs on September 12 2010, while at the PTC, Officer Kelly grabbed his foot and yanked him off the bench causing him to fall down and that Officer Jara jumped on him with her weight and pressed her fingers on his throat.  [See Exhibit A at 102:2-103:5]

30.     Mr. Hernandez claims that his shoulders, wrists, throat, and back were all sore as a result of the force that he claims was used against him on September 12, 2010.  [See Exhibit A at 106:24-107:4]

31.     Mr. Hernandez does not have any medical records or photographs documenting any alleged injuries.  [See Exhibit A at 109:22-110:2]

32.     When asked if he told any medical personnel at the jail about any alleged injuries, Mr. Hernandez said, "No."  When asked why he did not convey any such information, he responded "It did not occur to me to tell them."  [Exhibit A at 110:13-22]

33.     The August 8, 2010 and September 12, 2010 incidents did not deter Mr. Hernandez from serving food in the Fourth Street Mall area as Mr. Hernandez has continued to this date to distribute food in this area.  [Exhibit A at 122:2-15]

## SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Further, this court must view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party.  *Frye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1222 (10th Cir. 2008).

## DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY AGAINST ALL OF PLAINTIFF'S CLAIMS AS SET FORTH IN COUNTS I AND II OF THE COMPLAINT

### I.     Qualified Immunity Standard

Normally, the summary judgment standard requires a Court to review the evidence in the light most favorable to the non-moving party.  *See Bisbee v. Bey,* 39 F.3d 1096, 1100 (10th Cir. 1994).  However, summary judgment premised upon qualified immunity grounds is viewed somewhat differently.  *Hannula v. City of Lakewood*, 907 F.2d 129, 130 (10th Cir. 1990).  When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test.  *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir.

2000).   In order for a plaintiff's claim to survive summary judgment, the record must contain

facts that rebut the presumption of an entitlement to qualified immunity.  *See Medina v. Cram*,

252 F.3d 1124, 1130 (10th Cir. 2001) (emphasis added). For purposes of overcoming a

defendant-officer's presumption of immunity, a plaintiff has the heavy burden of showing both:

(1) the defendant-officer in question violated one of his constitutional rights and (2) the infringed

right at issue was clearly established at the time of the allegedly unlawful activity such that

"every reasonable official would have understood that what he [was] doing" violated the law.

*Ashcroft v. al-Kidd*, ____ U.S.____, 131 S.Ct. 2074, 2080, 2083 (2011).  Failure on either

qualified immunity element is fatal to a plaintiff's cause. Lower courts have discretion to decide

which of the two prongs of qualified-immunity analysis to tackle first. *See Pearson v. Callahan*,

555 U.S. 223, 236 (2009).

　　　　As to the constitutional inquiry, the question is whether the facts alleged, which are taken

in the light most favorable to the non-moving party, show that the officer's conduct violated a

constitutional right.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).  The

clearly established inquiry is more specific than whether the officer's conduct violated a

constitutional right; the question is whether it would be clear to a reasonable officer that his or

her conduct was unlawful under the circumstances he or she confronted.  *Saucier v. Katz*, 533

U.S. 194, 202 (2001).  "[T]he right allegedly violated must be defined at the appropriate level of

specificity before a court can determine if it was clearly established."  *Wilson v. Layne*, 526 U.S.

603, 615 (1999)(*citing Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  Moreover, "in order

for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on

point, or the clearly established weight of authority from other courts must have found the law to

be as plaintiff maintains."  *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir.

1992).  "A necessary concomitant to the determination of whether the constitutional right is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."  *Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *see also Bella v. Chamberlain*, 24 F.3d 1251 (10th Cir. 1994).  For a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) because the salient question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Hence, the general rule of qualified immunity is intended to provide government officials with the ability to reasonably anticipate when their conduct may give rise to liability for damages. When conducting this clearly established inquiry, it is inappropriate for a court to define a clearly established law at a high level of generality.  *See Brosseau v. Haugen*, 543 U.S. 194, 198-199 (2004) (per curiam); *Wilson v. Layne* 526 U.S. 603, 615 (1999); *Anderson*, 483 U.S. at 639-640.  The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier v. Katz*, 533 U.S. at 201.

## II.    Count I – Plaintiff's Fourth Amendment Claim Alleging Unreasonable Detention/Seizure/Search and Excessive Force

### A.    Fourth Amendment Seizure Analysis

In conducting an analysis as to the validity of Plaintiff's Fourth Amendment claims set forth in Count I, this Court must first determine at what point during the encounters which took place on August 8, 2010 and on September 12, 2010 the Fourth Amendment has been triggered. The Supreme Court has made clear that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions."  *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382 (1991).  To constitute a seizure, an encounter between an officer and a citizen must

involve the use of physical force or show of authority on the part of the officer such that a reasonable person would not feel free to decline the officer's requests or terminate the encounter. *Id.* at 439, 111 S. Ct. 2382.  However, "[u]nless the officer's show of authority succeeds in restraining the person, the person has not been 'seized' within the meaning of the Fourth Amendment." *Latta v. Keryte*, 118 F.3d 693, 698 (10th Cir. 1997 (*citing Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir. 1994).

"Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980).  "None of these factors are dispositive, nor should they be treated as exclusive...." *Fuerschbach v. SW Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006).   As explained in *California v. Hodari D.* 499 U.S. 621, 625-27, 111 S.Ct. 1547 (1991):

> [Common law] arrest requires either physical force ... or, where that is absent, submission to the assertion of authority. Mere words will not constitute an arrest, while, on the other hand, no actual, physical touching is essential. The apparent inconsistency in the two parts of this statement is explained by the fact that an assertion of authority and purpose to arrest followed by submission of the arrestee constitutes an arrest. There can be no arrest without either touching or submission.

For purposes of evaluating whether a person had been seized, "the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's *words and actions* would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628, 111 S.Ct. 1547 (*emphasis added quoting United States v. Mendenhall,* 466 U.S. 544, 553, 100 S.Ct. 1870 (1980)).  The

Tenth Circuit has followed this premise in that they have traditionally found a seizure when there has been an officer's order coupled with at least some display of force or action by an officer as a means intentionally applied to control an individual's movements. *See, e.g., United States v. Fox,* 600 F.3d 1253 (10th Cir. 2010) (Seizure found with officer's order coupled with action of officer entering into person's car); *United States v. Salazar*, 609 F.3d 1059 (10th Cir. 2010) (Defendant was seized when Mr. Salazar's pickup started to go around Trooper Berner's patrol car, Trooper Berner stepped out of his car, drew his firearm, and yelled at Mr. Salazar to stop and get out of the pickup which he did.); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001) (SWAT team brandished weapons and ordered plaintiffs to lie down on the ground); *United States v. King*, 990 F.2d 1552 (10th Cir. 1993)(seizure occurred when police officer ordered one defendant at gunpoint to place his hands on steering wheel or be shot after approaching defendants' automobile to warn them of traffic obstruction)

When applying the aforementioned principles to the instant case, Defendants contend that Plaintiff was not seized within the meaning of the Fourth Amendment until he was placed in handcuffs during the August 8, 2010 incident and again during the September 12, 2010 incident. This is the case because Plaintiff never submitted to any show of authority on either of these occasions until he was handcuffed. For instance, during the August 8th incident, Plaintiff was asked repeatedly to stop serving food unless he could produce a permit. However, Plaintiff continued to serve food and even told police that he was not going to stop and that the officers did not have a right to stop him. Consequently, Plaintiff was not seized until he was placed in handcuffs due to the crowd becoming incited. Similarly,during the September 12, 2010 incident, Plaintiff ignored Officer Jara when she asked him about the permitting issue and about the Criminal Trespass Notification. Consequently, he did not submit to a show of authority when

Officer Jara asked him about these issues. Therefore, Plaintiff was not seized during this encounter until he was handcuffed and placed under arrest.  This notwithstanding, in the event that the Court determines that Plaintiff was seized before he was placed into handcuffs during the August 8th and September 12th encounters, Defendants will discuss the legality of their actions under the Fourth Amendment with respect to detaining and/or arresting Plaintiff.

### B.      Plaintiff's Unreasonable Detention/Seizure Claim

Defendants advance two theories by which Plaintiff's detention/seizure was justified. First, Defendants contend that they were authorized to detain Plaintiff as part of their community care-taking functions.  Second, Defendants contend that there was reasonable suspicion for which to conduct an investigative detention.

A detention may be justified when officers are exercising "community caretaking functions" wholly separate and apart from detecting, investigating, or acquiring evidence of a crime. *See United States v. Garner*, 416 F.3d 1208, 1212 (10th Cir. 2005).   Police officers carrying out such functions may, in certain circumstances, properly detain a person. *Id. at* 1212-13.  "Like an investigative detention ... a community caretaking detention must be based upon specific and articulable facts which reasonably warrant an intrusion into the individual's liberty." *Id.* at 1213 (internal punctuation and quotation marks omitted). In addition, the government's interest must outweigh the individual's interest in avoiding arbitrary governmental interference. *See id.* "[T]he [community caretaking] detention must last no longer than is necessary to effectuate its purpose, and its scope must be carefully tailored to its underlying justification." *Id.*

An investigative detention, on the other hand, is an encounter in which police may "stop and briefly detain a person for investigative purposes." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Such a stop is a Fourth Amendment seizure, but does not require probable cause. *Oliver*

*v. Woods*, 209 F.3d 1179, 1186 (10th Cir.2000). Rather, a *Terry* stop is justified "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581 (*quoting Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "An encounter between police and an individual which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent." *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993)(*citing United States v. Brignoni-Ponce,* 422 U.S. 873, 881-82 (1975). "There is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop; rather our evaluation is guided by common sense and ordinary human experience." *United States v. Melendez-Garcia,* 28 F.3d 1046, 1052 (10th Cir. 1994)(quotations omitted). Further, a court should avoid "unrealistic second-guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones." *Id.*   (quotations omitted).

A court must analyze investigatory detentions under a two-part framework by determining: (1) whether the officer's action was justified at its inception and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir.2001) (en banc) (*quoting Terry*, 392 U.S. at 20). The detention is justified at its inception "if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir.2003) (*quoting United States v. Arvizu*, 534 U.S. 266, 273, (2002)) (internal quotation omitted). In assessing whether an officer develops an objectively reasonable and articulable suspicion of illegal activity, the Supreme Court has held reasonable suspicion may arise from the "totality of the circumstances" presented in each case.

*Arvizu*, 534 U.S. at 273.  In addition, "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *Id.* at 277. Thus, behavior susceptible to innocent interpretation may create reasonable suspicion depending on the totality of the circumstances confronting an officer. *See Oliver*, 209 F.3d at 1187–88. When determining if a detention is supported by reasonable suspicion, a court should "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Zubia–Melendez*, 263 F.3d1155, 1162 (10th Cir. 2001)(quotation marks omitted).  This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."  *United States v. Cortez*, 449 U.S. 411, 418 (1981).

> **1)    The officers' actions in initially contacting Plaintiff on August 8, 2010 and on September 12, 2010 were justified at their inception because the officers were acting in accordance with their community care-taking functions**

On both August 8, 2010 and on September 12, 2010, Officers Welch and Jara contacted Plaintiff to see if he had a permit to distribute food.   The officers were inquiring about the permitting issue in response to complaints from the business community that the crowd of people being fed were urinating, and leaving trash and feces in the area.  The officers were also trying to ensure that Plaintiff had a permit so that he was serving food which was sanitary and safe because, as explained by Officer Lonz, people have been served poisonous food in the past.  [See Exhibit D- Belt Tape, Track 1 at 23:10 – 23:43] Consequently, it was reasonable for Officer Welch and Officer Lonz to approach Plaintiff to inquire as to whether Plaintiff had a permit to serve food to make sure that the food he was serving was sanitary and safe as well as to address the sanitary concerns voiced by local businesses.  For the same reasons, it was also reasonable for Officer Jara to likewise approach Plaintiff to inquire about a permit on September 12, 2010.

> **2)**   **The officers' actions in initially contacting Plaintiff on August 8, 2010 and on September 12, 2010 were justified at their inception because the officers had reason to investigate whether Plaintiff was serving food without a permit contrary to Section 9-6-1-7 of the City of Albuquerque's Code of Ordinances**

Section 9-6-1-7(A) provides:

> It shall be unlawful for any person to operate a food establishment within the city who does not possess a valid permit issued for that food establishment by the enforcement authority.  Such permit shall be posted in a conspicuous location, and only such persons who comply with the requirements of §§ 9-6-1-1 et seq. and other applicable laws, regulations, and ordinances shall receive and retain such permit.  Permits shall not be transferable from one person to another person or establishment.  Permits for temporary food-service establishments shall be issued for a period of time not to exceed two weeks, to a specific person for a specific location and shall be issued only for specific special events.

As explained above, given that Officer Welch and Officer Jara had each observed Plaintiff distributing food in the Fourth Street Mall area and given the complaints that have been made concerning the distribution of the food, they each had reason to approach Plaintiff to investigate whether he was in compliance with City's Food Sanitation Ordinance by possessing a valid permit to serve food.

> **3)**   **The manner in which Plaintiff was detained on August 8, 2010 was reasonable.**

As explained above, Plaintiff was removed from the Fourth Street Mall area and placed in handcuffs because the crowd was becoming incited.  "Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a Terry] stop.'" *United States v. Perdue,* 8 F.3d 1455, 1462 (10th Cir. 1993)(*quoting United States v. Hensley*, 469 U.S. 221, 235 (1985)).  "[T]he use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest—for which probable cause is required—when the circumstances reasonably

warrant such measures." *United States v. Melendez–Garcia*, 28 F.3d 1046, 1052 (10th Cir.1994) (internal quotation marks omitted). Such measures are warranted, however, only if "the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* (internal quotation marks and citations omitted).   Further, "[a] law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993)(*quoting United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990), *cert denied,* 498 U.S. 1095 (1991)).

   With respect to the instant action, in order for the police to maintain control of the environment as they discussed the permitting issue, Plaintiff was removed from the immediate area, placed in handcuffs, and detained in the back of the police car.  Officer Welch did not place handcuffs on Plaintiff or search Plaintiff and therefore he did not personally participate in any alleged constitutional infraction.  *See Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) ("[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.") This notwithstanding there was no alleged constitutional infraction in the manner in which Plaintiff was detained since he was detained in the back of the police car for a short duration until the crowd had dispersed.  It would also not be unreasonable to conduct a pat-down search for weapons prior to him being placed into the police car for officer safety reasons.  *See United States v. Merkley*, 988 F.2d at 1064 (officer has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders.)  The length of Plaintiff's detention on August 8, 2010 was also reasonable as he was detained in the back of a police car for approximately 20 minutes until the crowd had dispersed.   *See, e.g.*

*United States v. Shareef*, 100 F.3d 1491, 1507 (10th Cir. 1996) (finding a 30 to 45 minute

detention to be reasonable under the circumstances.)

> **4)      The detention of Plaintiff on September 12, 2010 was conducted in a
> reasonable manner and it ultimately ripened into probable cause for
> Plaintiff's arrest.**

In speaking with Officer Jara about the permit and criminal trespass issues, Plaintiff was

never placed in handcuffs and his movements were not restricted.  However, once Officer Jara

verified that he had been issued a Criminal Trespass Notification on August 8, 2010, she had

developed probable cause to place him under arrest since he was directed not to return to the

premises. The probable cause standard allows a police officer to arrest a person without a

warrant if the officer has probable cause to believe that the person committed a crime.

*Tennessee v. Garner*, 471 U.S. 1 (1985).   "Probable cause exists if facts and circumstances

within the arresting officer's knowledge and of which he or she has reasonably trustworthy

information are sufficient to lead a prudent person to believe that the arrestee has committed or is

committing an offense." *Albright v. Rodriguez*, 51 F.3d 1531, 1536 (10th Cir. 1995)(*quoting*

*Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995).   "When a warrantless arrest is the subject

of a Section 1983 action, the defendant arresting officer is 'entitled to immunity if a reasonable

officer could have believed that probable cause existed to arrest' the plaintiff." *Romero*, 45 F.3d

1472, 1476 (*quoting Hunter v. Bryant,* 502 U.S. 224 (1991)).  Probable cause does not require a

finding of guilt beyond a reasonable doubt, nor does it require proof of a prima facie case. *See*

*St. John v. Justman*, 771 F.2d 445, 448 (10th Cir. 1985).   Rather, probable cause requires a

"substantial probability that a crime has been committed and that a specific individual committed

a crime." *Id.*  In the instant case, Officer Jara had developed probable cause to believe that

Plaintiff had committed the crime of Criminal Trespass since he was issued the Criminal

Trespass Notification on August 8, 2010 which directed him not to return to the premises.  *See* NMSA 1978 § 30-14-1(C) ("Criminal trespass also consists of knowingly entering or remaining upon lands owned, operated or controlled by the state or any of its political subdivisions knowing that consent to enter or remain is denied or withdrawn by the custodian thereof.")

Officer Kelly had no personal involvement in arresting and/or charging Plaintiff and therefore this claim fails on its face against her.  *See Foote*, 118 F.3d at 1423.  Officer Baca's involvement in the arrest was handcuffing Plaintiff after he was told by Officer Jara that she was placing him under arrest.  An officer who is called to the scene to arrest is not required to reevaluate the arresting officer's probable cause determination in order to protect himself from personal liability. *See Baptiste v. J.C. Penney Co.,* 147 F.3d 1252, 1260 (10th Cir. 1998) All that is required is that they secondary officer have an objectively reasonable reliance upon the primary officer's probable cause determination.  *Id.*  Therefore this claim fails against Officer Baca as well.

### 5)   Search of Plaintiff's person on September 12, 2010

The Supreme Court has long held that "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *United States v. Robinson,* 414 U.S. 218, 235 (1973). Also, "[s]ince police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a Terry] stop.'" *Perdue,* 8 F.3d 1455, 1462. Accordingly, given that Plaintiff was being arrested on September 12, 2010, it would not have been unreasonable for Officer Baca and/or other officers to search his person.

### C.      Plaintiff's Excessive Force Claim

In determining whether or not any of the individual defendants used excessive force against Plaintiff, this Court must decide if their actions were "objectively reasonable" under the circumstances.  *See Graham v. Connor*, 490 U.S. 386 at 397 (1989).   When analyzing the reasonableness of force of a seizure, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396.  The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer at the scene, rather than with the benefit of 20/20 vision of hindsight. *Id.* at 396-97.   Likewise, the reasonableness analysis should take into consideration " the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."  *Id.*   "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment."   *Id.* at 396 (internal citation omitted); *see also Latta*, 118 F.3d 693, 701 (10th Cir. 1997).

The Supreme Court has delineated three, non-exclusive factors relevant to the excessive force inquiry: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  The United States Supreme Court also explained the excessive force inquiry in the context of a qualified immunity analysis with its decision in the *Saucier* case.  *See Saucier*, 533 U.S. 194.  In *Saucier*, the Supreme Court found that, with regard to excessive force claims, there still must be a determination as to whether a reasonable officer could have believed that his conduct was lawful in light of clearly

established law. *Id.* at 201. The clearly established inquiry "must be undertaken in light of the specific context of the case not as a broad general proposition." *Id.*

Officers Kelly and Welch used no force against Plaintiff; consequently, they were not personally involved in any alleged constitutional violation. *See Foote*, 118 F.3d at 1423 Officer Baca placed Plaintiff in handcuffs on September 12, 2010 when he placed him under arrest and Officer Jara put these handcuffs back on him once she saw that he had somehow gotten out of the handcuffs. Plaintiff claims that Officer Kelly grabbed his foot and yanked him off the bench causing him to fall down and that Officer Jara jumped on him with her weight and pressed her fingers on his throat. Plaintiff also claims that his shoulders, wrists, throat, and back were all sore as of result; however, he has no evidence documenting any alleged injuries and he acknowledges that he did not complain of any injury while he was at the jail.

Even when accepting Plaintiff's version of the events, his excessive force claim fails as a matter of law because there is no evidence of actual injury that is not de minimis, be it physical or emotional. *See Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007). Therefore, given that Plaintiff has not suffered any injury which is beyond de minimis, his excessive force claim fails on its face. Even assuming that Plaintiff's injuries were more than de minimis, under *Graham*, handcuffing Plaintiff and using force to place him back into handcuffs during the September 12, 2010 incident would not have been unreasonable since, as the Supreme Court noted in *Saucier:* "'In *Graham* we noted that our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Saucier,* 533 U.S. at 208 (*quoting Graham*, 490 U.S. at 396).

**III.    Count II – Plaintiff's First Amendment Claim Alleging Deprivation of Freedom of Speech, Expression and the Exercise of Religion**

A claim of retaliation for the exercise of free speech must be analyzed under the following three part test where, as here, the Defendants are not employers of the Plaintiff or parties to a contract with the Plaintiff.  *See Smith v. Plati*, 258 F.3d 1167 at 1176 (10th Cir. 2001)(*citing Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir. 2000)).   "Such a plaintiff must prove: (1) he was engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."  *Id.*

As a preliminary manner, there is no evidence in the record that any of the Defendants took any action due to Plaintiff's speech and/or exercise of his religion.  Therefore, this claim should fail on its face since there is not any evidence that any of the Defendants personally participated in an alleged constitutional infraction in this regard.  *See Foote*, 118 F.3d at 1423. However, even assuming arguendo that Plaintiff can establish the first element, the record does not show that Plaintiff suffered injury which would chill a person of ordinary firmness from continuing to engage in that activity.  In fact, Plaintiff has not been deterred from serving food in the Fourth Street Mall area as he has continued to do so even after the August 8, 2010 and September 12, 2010 incidents.  Also, with regard to the third element where there must be proof that a defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct,  a number of courts have found that probable cause automatically negates evidence of improper motive.  *See Hartman v. Moore*, 547 U.S. 250, 265-66 (2006) (lack of probable cause must be shown for a First Amendment retaliatory prosecution); *Dahl v. Holley,* 312 F.3d 1228, 1236 (11th Cir. 2002)("Whatever the officers'

motivation, however, the existence of probable cause to arrest Dahl defeats her First Amendment [retaliation] claim."); *Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998)("When a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested.")  *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2nd Cir. 2001)(First Amendment retaliation claim failed "because defendants had probable cause to arrest plaintiff, [and therefore] an inquiry into the underlying motive for the arrest need not be undertaken"); *Smithson v. Aldriach*, 235 F.3d 1058, 1063 (8th Cir. 2000); *Merckle v. Upper Dublin Sch. District*, 211 F.3d 782, 796-97 (3rd Cir. 2000).   Accordingly, the probable cause for Plaintiff's arrest already discussed herein in Section II. B. 4) establishes that there was no improper motive in arresting Plaintiff on September 12, 2010.   Also, with respect to both the August 8, 2010 and September 12 2010 incidents, the reasonable suspicion that the officers had to believe that Plaintiff could have been violating the City of Albuquerque Food Sanitation Ordinance is further proof that Defendants' actions were not substantially motivated as a response to Plaintiff's exercise of his First Amendment rights.

**IV.    Even Assuming a Constitutional Violation, the Law was not Clearly Established that Defendants' Conduct was Unlawful**

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, ____U.S.____, 131 S.Ct. 2074, 2085 (2011) (*quoting Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986).   "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S.

635, 639, 107 S.Ct. 3034 (1987) (citation omitted).   As already stated above, it is important that when this Court conducts the clearly established inquiry that it must not define clearly established law at a high level of generality.  *See Brosseau*, 543 U.S. 194, 198-199; *Wilson v. Layne* 526 U.S. 603, 615; *Anderson*, 483 U.S. at 639-640.  Following this rationale, even presuming a constitutional violation, Defendants would not have been on notice that their conduct amounted to a violation.

As explained above, the Tenth Circuit and Supreme Court precedent clearly sets forth that it is reasonable suspicion can be predicated upon innocent activity and that officers may use firearms, handcuffs, and other forceful techniques to effect the detention when the circumstances reasonably warrant such measures. *See Terry,* 392 U.S. 1; *Arvizu*, 534 U.S. 266; and *Oliver*, 209 F.3d 1179; *Melendez–Garcia*, 28 F.3d 1046, 1052.  Further, the Tenth Circuit law is clear that an officer may take reasonable steps to protect himself and has an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists and therefore officers would not have been on notice that the pat down search and the detention of Plaintiff was unreasonable in this regard. *See Merkley*, 988 F.2d 1062.   With regard to the arrest of Plaintiff which took place on September 12, 2010, Defendants would not have been notice that this arrest violated the Fourth Amendment as the Supreme Court and Tenth Circuit law holds that an arrest is still lawful so long as probable cause existed as to any offense that could have been charged. *See Devenpeck*, 543 U.S. at 152-53; *Tanberg*, 401 F.3d at 1157. Also, the Supreme Court has long held that a search incident to arrest is reasonable. *See Robinson,* 414 U.S. at 235. Finally, as the United States Supreme Court in *Saucier,* the excessive force inquiry, there still must be a determination as to whether a reasonable officer could have believed that his conduct was lawful in light of clearly established law.  *Id.* at 201.   The *Cortez* case establishes that any claim for

excessive force requires some actual injury that is not de minimis, be it physical or emotional. *Cortez*, 478 F.3d 1108, 1129 (10th Cir. 2007).  Further, when conducting an arrest, an officer has the right to conduct some degree of physical force or coercion to effect it.  *See Saucier,* 533 U.S. at 208   Therefore, in light of Supreme Court and Tenth Circuit precedent, it would not have been beyond debate that *every* reasonable officer in Defendants' position violated the constitution based upon their conduct during the August 8, 2010 and September 12, 2010 incidents.  *See Ashcroft*, ____ U.S.____, 131 S.Ct. 2074, 2080, 2083 ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'")

## V.    Plaintiff's Official Capacity Claims

Plaintiff has also asserted claims against Defendants in their "official capacity." An official-capacity suit is treated as a suit against the entity which in this case would be the City of Albuquerque.  *See Kentucky v. Graham*, 473 U.S. 159 (1985).  Plaintiff's claims in this regard are premised upon his allegations that the individually named Defendants violated his constitutional rights.  However, the City of Albuquerque cannot be held liable under Section 1983 based upon a theory of respondeat superior where there are only allegations that an employee allegedly violated a person's constitutional rights.  *See Bd. Of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997)(rejecting respondeat superior liability)  Therefore, Plaintiff's "official capacity" claims fail on their face.

## CONCLUSION

**WHEREFORE**, based upon the foregoing arguments and authority cited herein, Defendants request that this Court grant Defendants' Motion and Memorandum in Support for

Summary Judgment Requesting Dismissal of Plaintiff's Complaint on Qualified Immunity

Grounds.

Respectfully submitted,

CITY OF ALBUQUERQUE
David Tourek
City Attorney


/s/ Stephanie M. Griffin
Assistant City Attorney
P. O. Box 2248
Albuquerque, NM 87102
(505) 768-4500

*Attorney for Defendants*


I hereby certify that the foregoing was sent via Notice of Electronic Filing to:

Anna C. Martinez
Albert L. Hutchinson, Jr.
P.O. Box 25304
Albuquerque, NM 87125
(505) 750-8005
anna@aequitas.pro

*Attorneys for Plaintiffs*


on this 9th day of May, 2013.

/s/ Stephanie M. Griffin, Assistant City Attorney